UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal Action No. 5: 16-045-DCR |
| ) | |
| V. ) | |
| ) | |
| CHARLES E. JOHNSON, JR., ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER** |
| Defendant. ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Defendant Charles Johnson, Jr. is accused of having committed four violations of the conditions of his supervised release. The evidence presented during the June 27, 2019, hearing demonstrates that the defendant committed all four violations as alleged.

**I.**

Johnson pleaded guilty in the Eastern District of Virginia to charges of conspiracy in violation of 18 U.S.C. § 371; securities fraud in violation of 15 U.S.C. §§ 78k(b) and 78 ff, 18 CFR § 240, 10b-5, and 18 U.S.C. § 2; tampering with a witness in violation of 18 U.S.C. § 1512(b)(3); and obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2). [Record No. 3-3] He was sentenced to a term of imprisonment of 108 months, followed by a 3-year term of supervised release. [Record No. 3-3, p. 2]

Johnson was ordered to pay restitution jointly and severally with Geoffrey Layne in the amount of $9,700,000.00. As of this date, however, only $10,729.38 has been paid. The United States contends that Johnson has never accepted his guilt and does not believe he should be required to pay restitution. Johnson was directed to use money from tax refunds, lottery

winnings, inheritances, judgments, and any unexpected financial gains to pay his court-ordered financial obligation. [Record No. 3-3, p. 4] United States District Judge Liam O'Grady entered a restitution judgment setting the monthly payments at a modest $300.00, based upon financial information provided by Johnson. Johnson's case was transferred to the Eastern District of Kentucky for supervision in April 2016. His term of supervision was originally set to expire on April 7, 2019.

Standard terms of Johnson's supervision included that he may not commit federal, state, or local crimes. [Record No. 3-3, p. 3] Additional conditions require that he report to his supervising probation officer as directed, submit truthful and complete written reports within the first five days of each month, and truthfully answer all inquiries from his supervising probation officer. [Record No. 3-3, p. 3] Johnson was also required to provide his probation officer with access to any requested financial information. [Record No. 3-3, p. 4]

Johnson was working as a member-manager of a handful of LLCs following his release from prison. He told his probation officer that he managed Curare and later Privato. He also managed other entities including JW2, Beaumont Noah, Luminary Diffusion Systems, Diffusion Investments, and JJSquared. Johnson, however, did not disclose these businesses to his supervising probation officer or through his monthly reports. [Record No. 39, pp. 17-18] In 2018 and 2019, the defendant facilitated deals on behalf of these companies and also sought money from investors. For example, he received $200,000.00 from Dr. Harry Lockstadt to be used for operating capital. [Tr. 259-60] Additionally, he helped facilitate a deal between DC Solar and Luminary Diffusion Systems. It is alleged that he used the money he received from investors and from business dealings to gamble in Las Vegas.

Johnson traveled to Las Vegas on multiple occasions and gambled at the Red Rock Casino and the Wynn Casino from the summer of 2018 to the spring of 2019. Johnson's winnings totaled $52,200.00 at the Red Rock Casino. However, he lost $442,190.00 in 2018 at the Wynn Casino, and an additional $34,675.00 in 2019 at that location. [Tr. 87-89; Gov. Ex. 4] Johnson contends that he was gambling in Las Vegas to capitalize his businesses.

The government claims that Johnson has committed four violations of the conditions of his supervised release. First, it claims that Johnson omitted his accounts at the two casinos (Red Rock and Wynn) from Probation Form 48 (that is, his net worth and cash flow statement form). Johnson signed the form declaring under penalty of perjury that the information was true and correct. The United States alleges that Johnson violated 18 U.S.C. § 1001 by not disclosing these accounts. If true, this would be a Grade B violation under the United States Sentencing Guidelines Manual.

On March 13, 2019, Johnson was interviewed by his supervising probation officer and stated that none of the money gambled in Las Vegas was part of a $200,000.00 payment from Dr. Harry Lockstadt. However, the government asserts that a financial analysis demonstrates that up to $25,000.00 of that amount was transferred into his Wynn Casino account. Johnson was asked again on March 14, 2019, if any of the $200,000.00 was used to gamble in Las Vegas and he again stated that it was not. The United States argues that this statement is false in violation of 18 U.S.C. § 1001(a Grade B violation).

Next, the government contends that Johnson did not submit truthful and complete written reports within the first five days of each month. These monthly reports require that Johnson list all expenditures over $500.00. The requirement would include that he report gambling losses. But Johnson did not identify any losses on his 2018 or 2019 monthly reports.

However, Johnson allegedly lost $442,190.00 during 2018 at Wynn Casino and $34,675.00 in 2019. If true, this would constitute a Grade C violation.

Finally, the government claims that Johnson violated 18 U.S.C. § 1001 by failing to report any gambling losses on his monthly reports. This would constitute a Grade B violation if proven.

An evidentiary hearing was conducted on June 27, 2019. And following briefing, additional arguments were held on August 2, 2019. During this later hearing, the defendant contended that the government did not carry its burden to demonstrate that Johnson had violated any of the conditions of his supervised release.

## II.

"Under 18 U.S.C. § 3583(e)(3), a district court may revoke a term of supervised release if it 'finds by a preponderance of the evidence that the defendant violated a condition of supervised release.'" *United States v. Jackson*, 477 F. App'x 377, 379 (6th Cir. 2012). Thus, the government must show that it is "more likely than not" that Johnson committed the alleged supervised release violations. *See United States v. Moses*, 289 F.3d 847, 852 (6th Cir. 2002).

### i. Alleged Violations of Supervised Release

#### a. Violation 1

The United States claims that Johnson violated 18 U.S.C. § 1001 by omitting material facts from his net worth statement (Probation Form 48). To show a violation of § 1001, "the government must prove that: (1) the defendant made a statement; (2) the statement is false or fraudulent; (3) the statement is material; (4) the defendant made the statement knowingly and willfully; and (5) the statement pertained to an activity within the jurisdiction of a federal

agency." *United States v. Steele*, 933 F.2d 1313, 1318-19 (6th Cir. 1991) (citing *United States v. Chandler*, 752 F.2d 1148, 1150 (6th Cir. 1985)).

Section 1001 criminalizes (1) falsifying, concealing, or covering up a material fact by any trick, scheme, or device; (2) making any materially false, fictitious, or fraudulent statement, or representation; or (3) making or using any false writing or document knowing it to contain any materially false, fictitious, or fraudulent statement or entry. 18 U.S.C. § 1001(a). A false statement made by a defendant to a supervising probation officer and while on supervised release may be the subject of prosecution under § 1001. *See United States v. Vreeland*, 684 F.3d 653, 664-65 (6th Cir. 2012) (holding that the judicial function exception to § 1001 does not apply to conversations between probation officers and defendants while on supervised release).

A statement is material if it has "a natural tendency to influence, or be capable of influencing, the decision of the decision-making body to which it was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995). A statement does not have to actually influence the agency to be material. *United States v. Rogers*, 118 F.3d 466, 472 (6th Cir. 1997). However, it must have the capacity to influence the agency. *Id.*

Johnson signed Probation Form 48 on October 5, 2018, captioned "declaration of defendant or offender net worth and cash flow statements." The document provides that the defendant declares "under penalty of perjury that the foregoing is true and correct. False statements may result in revocation of supervision, in addition to possible prosecution under the provisions of 18 U.S.C. § 1001, which carries a term of imprisonment of up to 5 years and a fine of up to $250,000.00, or both." [Gov. Ex. 1]

The government asserts that Johnson's Probation Form 48 contains material misstatements and omissions including:

> In Section A of the Assets portion, "Bank Accounts," at a minimum, Johnson failed to include the accounts at the Red Rock Casino, the Wynn Casino, and the JW2 account which he used to pay personal expenses.
>
> In Section K of the Assets portion, "Business Holdings," Johnson omitted that he was the managing member of, *inter alia*, JW2, Diffusion Investments, Luminary Diffusion Systems, and Privato.
>
> In Section M of the Assets portion, "Transfer of Assets," Johnson omitted any mention of the moneys he transferred from JW2 to Las Vegas casino accounts, which typically passed through his personal account. This section requires inclusion of "any assets that someone else is holding on your behalf."
>
> In Section B of the Liabilities portion, "Other Debts," Johnson omitted the promissory notes reflecting his alleged borrowing from JW2.

[Record No. 41, p. 11]

Courts have recognized that a defendant's failure to provide accurate information regarding his resources can be material because it can affect restitution orders. For example, the Eastern District of New York found that a defendant filed monthly reports containing false statements and lied during an interview with the probation officer when he indicated he had not been dipping into his business accounts to pay his personal expenses. *United States v. Kestenbaum,* 908 F. Supp. 2d 364 (E.D.N.Y. 2012), *remanded on other grounds by United States v. Kestenbaum,* 552 F. App'x 74 (2d Cir. 2014). The Court explained that the false statements were not mistakes or innocent oversights because the defendant was attempting "to present himself as unable to pay restitution while assuring that all the comforts of his lifestyle were met." *Id*. at 383-84. The defendant argued that even if the statements were false, they were not material. The court, however, concluded that:

> the false information provided to the government and the Probation Department was designed to affect their respective decisions as to whether to seek an increase in the defendant's restitution or issue a violation report. . . Because the false statements masked the true depth of [the defendant's] resources, and thus went directly to the heart of my direction to the Probation Department to obtain a full accounting of his financial circumstances, the statements were capable of influencing the decision to file the Violation Report.

*Id*. at 384-85.

Here, the same conclusion can be reached. By submitting false information, Johnson masked the depth of his resources to avoid likely increases in his monthly restitution payments. But Johnson asserts that he did not disclose any of the information because the funds he used to gamble were not his funds but belonged to the business entities with which he was associated. Johnson also contends that the accounts at the casinos are not "accounts." And even if they are accounts, he contends that they belong to the casino and not to him. He further explains that he did not affirmatively fill out the form by answering "none" to the questions on his net worth statement. [Record No. 40, p. 17] Finally, Johnson asserts that he had no intent to mislead when he filled out his net worth statement.

Based on the evidence submitted, the undersigned concludes that Johnson intentionally failed to disclose accounts at the Red Rock Casino and the Wynn Casino to avoid his personal gambling from being made known to his supervising probation officer. Contrary to the defendant's assertion, the accounts at the Red Rock Casino and the Wynn Casino were "accounts." Johnson could wire funds into and out of the accounts, he could convert the funds to gaming chips, and he could exchange chips for cash. Johnson had control of the money inside the accounts at both the Red Rock Casino and the Wynn Casino. And the net worth statement required that the defendant disclose all assets he owned or *controlled*. [Gov. Ex. 1] Further, Johnson had control over the JW2 account but failed to disclose it. For example, he

had a 2016 Jeep listed on his net worth statement with a monthly payment of $470.12. Johnson identified the vehicle on the net worth statement as a personal liability; however, but he used the JW2 account to make payments on the vehicle. [Gov. Ex. 5; Tr. 111-12] He also wrote checks to himself from the JW2 account. [*Id.*] Johnson also went to great lengths to conceal his control over the funds by giving Nicholas Perrino a 100% ownership interest over JW2 and through the creation of promissory notes for fictitious personal loans from that entity. Further, Johnson never advised Chief Financial Officer Dustin Dixon that he was gambling for the purpose of raising capital for the businesses. [Tr. 176]

Johnson also never mentioned to his supervising probation officer or identified on his net worth statement that he was the managing member and signatory for a host of LLCs including JW2, Beaumont Noah, Luminary Diffusion Systems, Diffusion Investments, and JJSquared. [Tr. 85] But he utilized the undisclosed LLCs to move money to gamble in Las Vegas at Red Rock Casino and Wynn Casino. [Tr. 87-88] Johnson won a net of $52,200.00 at Red Rock. He then lost $442,190.00 in 2018 and an additional sum of $34,675.00 in 2019 at the Wynn Casino. [Tr. 87-89; Gov. Ex. 4] Johnson also converted more than $10,000.00 from chips to cash. [Tr. 113] It is also noteworthy that, when Johnson won money at the casinos, he did not invest his winnings back into the businesses. [Tr. 111-12]

Johnson helped facilitate a deal between DC Solar and Luminary Diffusion Systems in the summer of 2018. DC Solar provided $1,021,500.00 to Luminary Diffusion Systems on July 2, 2018. [Tr. 92] Johnson transferred the $1,021,500.00 from Luminary Diffusion Systems to Diffusion Investments, LLC. [Gov. Ex. 5] He then transferred $475,000.00 from Diffusion Investments to JW2. [*Id.*] Johnson then transferred $100,000.00 from JW2 to the Red Rock Casino, which he then converted to a cashier's check. [Tr. 112] Johnson told his

- 8 -

Chief Financial Officer that he earned a $100,000.00-$150,000.00 bonus for the DC Solar deal that would be paid in to the JW2 account. [Tr. 171-73] Johnson also transferred $200,000.00 from JW2 to his personal account at Central Bank, and then transferred the $200,000.00 to his account at the Wynn Casino on July 9, 2018. [Gov. Ex. 5]

Finally, Johnson did not disclose information about the $200,000.00 payment from Dr. Harry Lockstadt (discussed in more detail below). Johnson would transfer money through various business entities until it was ultimately transferred into the casinos for his benefit. [Tr. 112] For example, one investor (GLA Resources) deposited $232,500.00 in the account for Diffusion Investments. Johnson then moved $75,000.00 from Diffusion Investments to Privato Group to JW2. He then transferred $50,000.00 from JW2 into his personal account and wired that money to the Wynn Casino. [Tr. 100-01; Gov. Ex. 5]

Johnson did not disclose any of this information to his supervising probation officer, on his monthly reports, or on Probation Form 48. He also failed to disclose that he was a managing member and signatory of the LLCs, he did not disclose that he transferred money from the business accounts to the casinos, and he did not disclose his gambling wins and losses.

By failing to disclose the above information on Probation Form 48 and by taking steps to conceal his non-disclosure, the defendant violated § 1001. In short, Johnson concealed material facts he knew he should have disclosed. And failing to disclose this information is material because it impacts his ability to repay his financial obligation in a more timely fashion. *See Kestenbaum*, 908 F. Supp. 2d at 384-85; *see also United States v. Jones*, 332 F. App'x 801, 805 (3d Cir. 2009) ("[A] statement to a probation officer concerning one's financial resources will obviously affect the officer's determination of ability to pay.") (internal citations omitted). The net worth statement explicitly provided that Johnson was to fully disclose his

financial resources, including a complete listing of all assets that he owned or controlled and any assets that had been transferred since his arrest. [Gov. Ex. 1] Additionally, the failure to disclose this information is within the jurisdiction of a federal agency because it was on Probation Form 48 and in statements made to his probation officer. Further, Johnson's failure to disclose this information was knowing and willful, as demonstrated by the fact that he provided promissory notes to explain why he was paying money to himself from the JW2 account. It is more likely than not that Johnson knew that he needed to report this information on Probation Form 48. Accordingly, the Court concludes that Johnson committed the first violation of the conditions of his supervised release as alleged by the government.

b. Violation 2

Johnson's second alleged violation concerns lying to his supervising probation officer regarding the source of funds he gambled in Las Vegas. Johnson received $200,000.00 from Dr. Harry Lockstadt in December 2018 and he deposited that money into his personal bank account at Central Bank. Johnson told Lockstadt that the money he provided would be used for operating capital. [Tr. 259-60] After Johnson put the money into his personal account, he transferred it through accounts for JW2, Diffusion Investments, and Privato Group. [Gov. Ex. 5] Johnson then transferred $60,688.81 from Privato Group to JW2 on December 17, 2018. [Tr. 105-06] Later in December, Johnson transferred $25,000.00 from JW2 to his personal account and then to the Wynn Casino.

FBI Analyst Chris Darmand testified that there would not have been enough money in the JW2 account to fund the $25,000.00 gambling expense but for the $200,000.00 from Lockstadt. The Court credits this testimony as accurate. Further, according to Darmand's

tracing, anywhere from $8,000.00 to $25,000.00 of the investment was included in the wire transfer from JW2 to the account at the Wynn Casino. [Tr. 102-109]

Probation Officer Jon Rapier testified that he asked Johnson if he used any of the money received from Lockstadt to gamble in Las Vegas. [Tr. 23-24] Johnson denied doing so in an in-person meeting on March 13, 2019, and during a telephone conversation the following day. Additionally, in May 2019 Johnson told Rapier that none of the money provided by Lockstadt was gambled in Las Vegas. However, Johnson changed his story and claimed that he did not need Lockstadt's money to gamble in Las Vegas. [Tr. 65-66] A long-time friend and business associate of the defendant, John Roanoke, testified that he overheard Johnson tell Rapier that Lockstadt's money "wasn't needed" on March 14, 2019. However, Roanoke has a vested interest in seeing that Johnson does not get into trouble. Officer Rapier's testimony supports the conclusion that Johnson merely denied using money provided by Lockstadt to gamble in Las Vegas, not that he said the money was not needed for that purpose.

Johnson asserts that this violation turns on the precise question that was asked because a statement that is literally true cannot form the basis of a false statement conviction. A defendant may not be convicted for a false statement that is "literally true but not responsive to the question asked and arguably misleading by negative implication." *Bronston v. United States*, 409 U.S. 352, 353 (1979). However, "the question and answer must be examined in the context of the investigation as a whole and the state of the defendant's knowledge in order to determine whether ambiguity exists." *United States v. DeZarn*, 157 F.3d 1042, 1048 (6th Cir. 1998) (holding that the defendant had an unambiguous understanding of the investigator's question even though the question was incorrect). The court in *DeZarn* explained that:

> A question that is truly ambiguous or which affirmatively misleads the testifier can never provide a basis for a finding of perjury, as it could never be said that one intended to answer such a question untruthfully. But, where it can be shown from the context of the question and the state of the testifier's knowledge at the time that the testifier clearly knew what the question meant, the Government must be permitted to present, and the fact-finder to consider, those contextual facts.

*Id*. at 1049.

AUSA Paul McCaffrey asked Officer Rapier "did you ask him specifically if any of Lockstadt's money had been gambled in Las Vegas?" [Tr. 23] Officer Rapier replied that he did and Johnson responded that it had not been used. [Tr. 23] Rapier also explained that he "asked [Johnson] multiple times during the meeting [] if any of the doctor's $200,000 loan had gone to Las Vegas. He indicated that it hadn't." [Tr. 23] Rapier testified that when he called Johnson the next day, he inquired about any of the doctor's money going to Las Vegas and Johnson again indicated that it did not. [Tr. 23-24] Rapier testified that in May 2019 Johnson changed his explanation and told him that the money was not needed to gamble in Las Vegas.

It is clear that the questions asked by Rapier were intended to determine whether money that originated from Lockstadt's investment was used to gamble in Las Vegas based upon the context of the investigation and questioning. Rapier explicitly asked Johnson if Lockstadt's money had been used in Las Vegas on two separate occasions, Johnson said it had not, and tracing on the money indicates that somewhere between $8,000.00 and $25,000.00 of Lockstadt's investment was gambled in Las Vegas. Johnson knew that his supervising probation officer was interested in where the funds for gambling had originated and he knew that he was under investigation. [Tr. 78-79] In context, it is clear that the questions go to whether Lockstadt's investment was the source of the funds gambled in Las Vegas. Johnson's

statement is not literally true because he said the money had not been used to gamble in Las Vegas and the tracing done by Darmand clearly indicates that it was.

In conclusion, Johnson knowingly and willfully made false statements to his supervising probation officer regarding the source of his gambling funds in Las Vegas. The defendant questions whether $8,000.00 is material. But this money and Johnson's lies about it are material because they impact the defendant's ability to pay his restitution. *See Kestenbaum*, 908 F. Supp. 2d at 384-85. The government asserted at the final hearing on the supervised release violation that the statements were material not because they impacted his ability to pay restitution, but because they would have the natural tendency to influence the probation officer in determining whether Johnson committed a new crime. Similar to *Kestenbaum*, where the court explained that false statements about the defendant's net worth would influence the probation officer's decision to issue a violation report, Johnson's false statements could influence the probation officer's decision to issue a violation report or for the government to seek further charges. 908 F. Supp. 2d 384-85. Additionally, the statements are material because money placed into accounts over which Johnson had control could impact his ability to pay restitution in an amount greater than $300.00 per month. Therefore, the defendant violated his probation by violating 18 U.S.C. § 1001.

c. Violation 3

Johnson's third alleged violation concerns his failure to submit complete and truthful monthly reports regarding his expenditures by omitting his gambling losses from his 2018 and 2019 monthly reports. Instructions on the monthly reports require the defendant to report any gambling losses over $500. While the monthly reports were not introduced into evidence, the

probation officer testified about them and how the defendant failed to include any information about gambling losses on the forms.

Johnson lost $442,190.00 in 2018 and $34,675.00 in 2019 at the Wynn Casino. But he asserts that the gambling losses were not his. Instead, Johnson claims that he was gambling to raise money for capital investments. But as mentioned earlier, the defendant did not return the $52,200.00 won at the Red Rock Casino to the businesses. This further illustrates that Johnson was gambling for his own benefit, and not for the benefit of the business entities. [Tr. 111-12] In short, Johnson should have reported the losses because they were *his* gambling losses. Accordingly, the Court concludes that the defendant violated his conditions of supervision by intentionally failing to provide truthful and complete monthly reports.

### d. Violation 4

Finally, the government claims that Johnson violated § 1001 by falsely certifying that his 2018 and 2019 monthly reports were true and correct. Several cases support this Court's conclusion that Johnson's false certifications violate this statutory section. For example, in *Kestenbaum*, the defendant falsely reported his monthly cash flow, including $0 net earnings from his employment in December 2010. 908 F. Supp. 2d at 382. However, he received payments from a cake delivery company and from the law firm defending him. *Id*. The court concluded that the defendant failed to disclose these payments. Additionally, it concluded that the defendant submitted a second monthly report that included false statements because he received an undisclosed check from his company. *Id*.

In *United States v. Taintor*, the court found that the defendant failed to report a $27,732.00 distribution as a cash inflow on his monthly report. No. 7:01-cr-219, 2003 U.S.

Dist. LEXIS 685 (N.D.N.Y. 2003). It concluded that the defendant willfully and knowingly made a false material statement regarding his income on his December 2001 monthly report.

Here, Johnson never disclosed any of his gambling losses throughout 2018 and 2019 on any of his monthly reports. Simply put, he did not disclose information that he knew he was required to disclose on his monthly reports. Johnson claims, however, that the gambling losses were not his because he was gambling on behalf of the business entities. But he never returned the money he won at Red Rock Casino back to the businesses, demonstrating that he was gambling for his own benefit, not on behalf of the businesses. [Tr. 111-12] Additionally, Johnson never informed his supervising probation officer he was going to Las Vegas to gamble on behalf of the businesses, nor did he tell his Chief Financial Officer that he was gambling on behalf of the business entities. Based on all of the foregoing facts, the undersigned concludes that Johnson violated § 1001 by failing to disclose the gambling losses on the fifteen monthly reports.

### ii. Motion to Strike

Johnson has filed a motion to strike the e-mail attached as exhibit 1 and corresponding references to it in the United States' post-hearing brief. [Record No. 42] He argues that the government is submitting evidence after the hearing concluded, the exhibit is not authenticated, and Johnson was not able to rebut the message or confront a witness against him. [Record No. 42] The United States explained in its post-hearing brief that it had not entered the e-mail at trial because:

> [t]his e-mail was produced to the United States by Privato Group on or around May 3, 2019 in response to a subpoena, along with approximately 35,000 other records. Despite diligent review of the Privato documents, the United States was not aware of this e-mail until after the June 27 revocation hearing, and therefore could not use it in its presentation of evidence. The United States

believes Johnson's admissions in the e-mail to be highly probative, and thus submits it here for the Court's consideration.

[Record No. 41, p. 9, fn. 3]

The government filed a response asserting that it had not had time to go through all of the records before the June 27, 2019 hearing, in part, because of technical delays caused by the format in which Privato Group produced the files. [Record No. 44] Additionally, it contends that there was nothing to rebut because the e-mail is from Johnson and he should not need to rebut his own words. [*Id*.] Johnson argues in his reply that the government cannot continue to submit proof after the conclusion of the hearing and that it has deprived him of the chance to object. [Record No. 45]

Johnson also asserts that that the document has not been authenticated under the Federal Rules of Evidence. However, the Federal Rules of Evidence do not apply at a supervised release hearing. *See* Fed. R. Evid. 1101(d); *United States v. Vixamar*, 679 F.3d 22, 30 (1st Cir. 2012). At a supervised release hearing, a district court "may rely upon reasonably reliable evidence." *United States v. Thompson*, 314 F. App'x 797, 799 (6th Cir. 2008). Additionally, the defendant does not argue that the e-mails are not authentic, merely that they have not been authenticated. Further, the defendant was the individual who drafted the e-mail and provided the e-mail to the government.

As a practical matter, however, there is sufficient evidence to conclude that the defendant violated the terms and conditions of his supervised release without the e-mail. Therefore, the motion to strike will be granted.

**III.**

The evidence presented at the hearing demonstrates by a preponderance of the evidence that the defendant committed all four of the violations of the conditions of his supervised release. Accordingly, it is hereby

**ORDERED** as follows:

1. Defendant Charles Johnson Jr.'s term of supervised release is **REVOKED**.

2. Defendant Johnson's motion to strike [Record No. 42] is **GRANTED**.

3. This matter is set for a hearing on **Thursday, August 8, 2019**, beginning at the hour of **1:30 p.m.**, at the United States Courthouse in Lexington, Kentucky.

Dated: August 5, 2019.

Signed By:
*Danny C. Reeves*
United States District Judge